Our next case is Samsung and Apple v. Smart Mobile Technologies, 2024, 1351 and 1352. Ms. Oliver, good morning. Good morning, and may it please the Court. Angela Oliver on behalf of Apple. I'd like to begin by addressing collateral estoppel. Claim one in this case presents the same question of patentability as in the 739 and 501 IPRs. Under Max Linear and Google, the Court should hold claim one unpatentable. Google tells us that collateral estoppel depends on whether claims describe substantially the same invention and whether any differences are material to alter the question of invalidity. I've got a little confused by your collateral estoppel argument. It felt like a bit of a mix-and-match between issue preclusion and then like a patent claim-by-patent claim preclusion, which I'll call the Ohio Willow kind of comparison, where you compare literally one claim to an invalidated second claim to determine whether there's really any meaningful differences between the two patent claims. Then there's another kind of estoppel, issue preclusion, which is does a specific prior art reference teach a particular claim limitation? And we have examples in our case law where you can apply issue preclusion in that kind of a context. Here, it was unclear. I need you to explain your argument as to estoppel here. Is it a patent claim versus patent claim comparison, such that patent claim here is not different at all to the claim that had gotten invalid in an earlier IPR related to a similar patent? Or are you trying to just hone in on this one limitation about dynamic configuring and whether that particular limitation has already been resolved? Which one is it? Your Honor, respectfully, it's both, and we think that the result is the same either way. And so as an example, in this court's decision in Google, the court did a claim-to-claim comparison, but that was still framed in terms of issue preclusion in that case. So where in your blue brief did you do, this claim is no different than claim X, which has been already invalidated? Sure. So in page 29 through 31 of our blue brief, we have a chart that compares the claim language of the 739 patent to the 936 patent. And then for the limitation that's the significant difference, which is the dynamic configuration limitation, we addressed that in page 30 to 31 in the paragraph beginning, despite the minor differences. You'll have to forgive me, because I read this section of your brief as just honing in on the dynamic limitation, and that the dynamic limitation issue had already been resolved in a prior case, which had a very, very similar dynamic limitation. And we think that is also our position, if you view the issue more narrowly in that sense. Can you, I don't know, read a couple sentences to me that say, you know, under Ohio Willow, the claim here in front of us with the 936 patent is already, should be invalidated based on patent claim X from a different IPR. Sure. So we cite Google, and Google applies the Ohio Willow Wood analysis. And so I think that's the case law we relied on. And so on page 31, for example, starting on the paragraph that says, though the 739 patent. So this is where we go through the comparison of the particular claim language. Claim language between the 739 claim versus claim language for the 936 patent claim at issue in this case. Now, taking a step back, I do think that I understand the court's position here. And I do think this is a very unique case in this context, because the claims are very similar. And so the issues kind of collapse together in this sense, because the claim language, as we've shown in this chart, is identical for many of the limitations or nearly verbatim. It's really this dynamic limitation that is what the comparison boils down to. And so whether you view it as looking at the claim versus the claim in a different case, that whether they have substantially the same scope or if there's any material differences patentability, or if you look at the narrower issue of whether St. Allen teaches this dynamic limitation, it reaches the same result. Again, this is just a unique case in that sense. Where did you go through the differences between the two claims and then explain away why those differences have no value? Sure. I think 31 is a good example of that, because that's where the claim that matters most is being compared limitation by limitation. And so taking a step back to page 30, I think the prior paragraph to the one I just cited is helpful as well. So the last sentence on page 30, the issue of patentability here is the same between both cases. And then at the top of 31, we say the minor differences between the limitations don't bear on this issue, while the 739 requires the server to enable dynamic configuration from a first function to a second. The 936 patent is even more generic. That limitation merely requires the device to be configurable. So to be configurable, not to have a server involved in that process. So it's more generic than the earlier 739 patent was. So that we believe was the most material limitation here. And so we've done that claim by claim comparison in that context. Now, even if the court views the issue more narrowly, whether St. Tongue teaches the dynamic limitation, the requirements for issue preclusion are still met. And again, the result ends up being the same, because this was the only disputed limitation with respect to ground one of the petition's analysis. Everything else... But in this IPR, you never advanced an argument that St. Tongue teaches the dynamic configuring limitation, is that right? That's correct. So, I mean, when we compare then the facts of this case to prior cases where we've applied issue preclusion in these kinds of companion IPRs, it's always been about a very specific prior art reference teaching a very particular claim limitation. And here, you're trying to get the benefit of a finding that some other prior art reference, other than the one you asserted here, is having met this very dynamic configuring limitation. And that feels like apples and oranges to me. Well, let me raise two points in response. He only represents apples, not oranges. Okay. Well said. I don't know. It feels like oranges and cherries to me. Two points. I think Max Linear is helpful here, because there, the court relied on issue preclusion between IPRs where the two IPRs raised completely different prior art. And the court said, remanded to the board in that case to address the patentability of the claims in view of the different prior art cited in the other IPR. So this case, I think, is actually much easier and closer than Max Linear, because we did rely on the same combination of art between the two proceedings. And to get more granular on that, in this case, we did still cite the exact portion of St. Tongue that was relied on in the 739 and 501 IPRs. That's this idea of a pre-programmed routine to determine when to switch. We cited that here in this case in limitation 1.5 for a different switching limitation. Now, going to the other IPRs, the board looked at those limitations in conjunction together. 1.5, 1.9, which is the dynamic conversion limitation in those cases, and then dependent claim 2 in those cases, which talked about switching dynamically. The board understood that those concepts were all referring to the same type of thing. This idea of switching from one function or one network to another. And so in this case, when it came up in limitation 1.5, we cited that same portion of St. Tongue, and it's the same thing the board cited in the other cases, and it's what we cited here in this case. It's column 16, lines 28 through 34. And the petition in this case also described that in presenting the overall combination. St. Tongue was to provide a technique for how the terminal in Rautiola's system would determine when it's leaving one network and going to another. The petition also explained this would result in Rautiola's laptop using a pre-programmed routine to determine when to switch. And so we believe this was raised here, even if that were relevant. But again, under Max Linear, we think as a matter of law, that did not have to be presented here for the issue preclusion case law to take effect. And that issue was litigated in the 739 and 501 IPRs. Again, Apple mapped St. Tongue to switching dynamically in those IPRs, and the board found that that is what ultimately taught that limitation. The board ultimately concluded in the prior IPR that you, in effect, relied on St. Tongue for the dynamic conversion limitation. And there's just, you know, by going through dependent claim two, here for this particular IPR, we just don't have any kind of similar sorts of evidence to suggest a way to back our way into reading your IPR petition as relying on St. Tongue for this dynamic configurable limitation. Oh, respectfully, I think we do. I think that's in limitation 1.5 of the petition here, which talks about switching. Right, but then you're asking a lot of us to say what you pointed to with respect to one limitation, we should now treat as being a live issue for a separate limitation. Well, Your Honor, our position is that this was fully and finally decided in the earlier IPRs. The board found this concept was properly pleaded and litigated there, and it decided the case on that basis. That is enough in this case to apply issue preclusion. It's already been decided that this particular piece of St. Tongue teaches this concept. Can you get to the claim construction?  Your Honor, I think there are two most important points on the claim construction here. The court should not limit the dynamic term based on the specifications of references to the device switching itself or switching automatically. Dependent claim 12 requires the device to be switched by an external source, a carrier. So if claim 1 is limited to the device switching itself, that would produce an inconsistency when you get to dependent claim 12 that has something other than the device making that switch. Now, the second point I'll mention is the prosecution history of the great grandparent application. It's simply too ambiguous to be used here for claim construction. The statement at issue in that case does not refer to dynamically configurable. The specification here does talk about how the wireless device switches itself and senses the changes environment. And in that way, that feels consistent with the use of the phrase dynamically configurable in that the claim is contemplating some kind of shape-shifting device that, based on changing conditions, will change the protocols. And so all of that is being done automatically or based on prior stored instruction sets. But it's still the same outcome. At the time of configuration, it's all being done without any user intervention. What we've argued is that the sensing aspect, that automatic sensing, is not necessarily the same as the switching, the question of what causes the device to switch. Again, we see in claim 12 that there is something other than the device itself that causes the device to switch, regardless of how that sensing, that automatic sensing, happens. But even if that were the only embodiment disclosed in the specification, this court's case law has said that we do not limit claims to the only embodiment in the specification unless that piece of it is essential. And here, there are only a few pieces of the specification that refer to this actual switching part being automatic or the device switching itself. Some of those are permissive. But again, this is not reflected as the essential aspect of what this invention was. It's a minor portion of the specification. And at the end of the specification, the patent team makes clear that these examples were not intended to be limiting. And so under cases like Aventis Pharma versus Hospira... The prosecution history did make clear that it was distinguishing merit, the merit reference, because that system is manual and can't do dynamic sensing or dynamic conversion. Your Honor, not exactly. We think that is not clearly what was being explained at 2360. The dynamically configurable limitation was not discussed on that page. It was discussed on the prior page, in the prior paragraph. And there, when you look at the last page, the last sentence, this is appendix page 2359, you can see that the actual distinction was that the prior art device could not be reconfigured at all. It wasn't a matter of... That's where you enter your rebuttal time. So why don't we hear from the other side, and we'll give you three minutes for rebuttal. Thank you. Mr. Shaw. Thank you, Your Honor. Again, Greer Shaw on behalf of the patent owner, Smart Mobile. I'd like to address the collateral estoppel issue first. As the court noted in the PAPS licensing, the Samsung case, 924F3-1243, quote, a tribunal's resolution of an issue that is only one part of an ultimate legal claim can preclude the loser on that issue from later contesting or continuing to contest the same issue in a separate case. In our view, Your Honor, that shows that the issue here is something narrower than just validity writ large. And in fact, the court's precedents show that depending on the context of a particular case, the issue for collateral estoppel could be a factual or legal issue that is only one part of the ultimate validity question. For example, in PAPS licensing itself, the issue was construction of a particular claim term and the teachings of specific prior art references. In Sincor v. Vicor, which is 988F3-1341, the issue was whether an artisan would have been motivated to combine two particular prior art references. Nestle v. Steuben Foods, 884F3-1350, another example of the issue was construction of a specific claim term. So the issue can be much narrower than just validity writ large, and we think that applies here. And in fact, Apple, in its opening brief, expressly defined the issue. This is page 30 of Apple's brief. Quote, the issue of patentability here is whether the prior art teaches the dynamic slash dynamically limitation under Smart Mobile's claim construction. What's the prior art? The prior art is the prior art that Apple cited in support of round one in its petition, a reference called Regnier, a second reference called Ratiola, and a third reference called Sainton, which we've talked about earlier today. So the issue there is, does that prior art teach this dynamic configuration limitation? And more specifically, the issue, the finding that Apple's attempting to take from the earlier cases and apply here is, does Sainton specifically teach dynamic configuration? And our point, Your Honors, is that issue, that specific issue, was never litigated in the 739 or 501 IPOs. Apple never argued that Sainton taught dynamic configuration in those cases, or dynamic conversion was the claim term in those cases. For purposes of today, we can assume that they have the same meaning. Apple never argued that Sainton taught that. That's something that the board came up with on its own. That was an argument, again, that the board just came up with on its own. That was not an argument that Apple made. In fact, the board expressing- That's a final written decision that's now gone final, right? I'm sorry? You never appealed that board decision. We did not appeal that. So now it's a fixed finding that Sainton teaches that dynamic conversion limitation. It's a fixed finding, but the FWDs in the 739, for example, the board expressly said, we recognize that the petition does not explicitly address Sainton in limitation 1.9. That's at appendix 3123. There is the same assertion verbatim in the 501 FWD, and that's at appendix 3276. So the board itself recognized in those cases that it was going out on a limb. It was making up its own argument that Apple never presented, that Sainton teaches this dynamic configuration limitation. So yes, Your Honor, it's correct that we did not appeal those FWDs. That may foreclose our argument that we did not have a full and fair opportunity to litigate the issue. However, there is a separate prong for issue preclusion, which is was the issue actually litigated? Was the issue actually litigated in the prior proceedings, which is separate from a full and fair opportunity? And I think the Court's precedents, for example, the Inouye-Freeman case, 930 F3rd of 1466, points out issue preclusion requires that the relevant issue was actually litigated in the first suit. The Court goes on at page 1466. The parties must have disputed the issue, right? So it's not enough that the issue was decided in the prior proceedings. It's required that the parties had actually disputed the issue. And in the Brain Life case, 746 F3rd, 1045, the Court suggested that if neither party argued or briefed the issue, that supports the finding that it was not actually litigated. And that's exactly what we have here. In the 739 and 501 RPRs, Apple never argued that Sainton teaches dynamic configuration, dynamic conversion in those cases. That's something the Board came up with on its own. Because Apple did not present that theory in its petition or any of its briefing or at trial, of course, Smart Mobile had no need to respond to an argument that was never made. So Smart Mobile did not address that issue in its briefing, and the issue never came up at trial. We saw that for the first time in the final written decision. Again, as I pointed out in the FWDs, the Board itself expressly admitted that Apple's petition did not rely upon Sainton for the dynamic conversion limitation, limitation 1.9. The Board made that observation in both FWDs and 739 and the 501. Unless there are any additional questions, I'll move on to the claim construction issue. So the claim construction issue centered on what does dynamically mean. What does dynamically mean? This was hotly contested. The Board agreed with Smart Mobile's interpretation that dynamically configurable means, quote, configurable when and as needed and in real time without the need for user intervention. And I would point out that the in real time part is not something that Smart Mobile advocated for. This was a gloss that the Board put on the construction. But really the focus here in this proceeding and in the briefing is the part without the need for user intervention. This is something that the Board initially rejected at the institution stage, and we turned them around. We persuaded them that, in fact, the way the patent uses that term, both in the specification and the claims and the prosecution history, dynamically means a change, a reconfiguration of the device that occurs without the need for user intervention. The user doesn't have to do anything. The device just does it, as Your Honor pointed out. For example, the device can detect its environment, detect how strong a particular signal is, and it can convert itself, let's say, from Wi-Fi to cellular, for example. The Board went on to describe without the need for user intervention means absent user command at the time of dynamic configuring. This is with Appendix 33 and also Appendix 48 and also Appendix 16. So the Board's interpretation of construction insofar as without the need for user intervention was SmartMobile's proposed construction. In our appeal brief before the Court, we walk through in some detail why we think that construction is correct in terms of the claim language. That's at pages 26 to 30 of our brief. The specification, which is at page 30 to 45, we go into quite a bit of detail, highlighting each and every instance in the specification where it talks about the device automatically changing itself. It senses its environment and it changes itself. There's many examples of that in the specification, and we highlight essentially all of them in our brief, pages 30 to 45. I won't go over those right now. We also talk about extrinsic evidence, which is at pages 53 to 57. The point I did want to highlight today is the prosecution history, and this is maybe one of those rare cases where the prosecution history is just crystal clear. There's just no doubt. The examiner, in a great grandparent application of the patent at issue today, the examiner rejected numerous claims on the basis that a prior reference merit taught, quote, means for dynamically configuring the partial functionality of the device, close quote. That's at Appendix 2319. There were many claims rejected under this rejection on merit, claims that recited dynamically configurable or variations thereof. There were also some other limitations and other claims that had the word dynamic, but some other capability, for example, signaling, sensing, adjusting, for example. In response, the applicant noted that merit required the user, quote, to enter a preferred communication mode using the touch-tone keypad on a telephone station, close quote, whereas the applicant's device converted between modes, quote, utilizing its built-in processing and other capabilities in a stand-alone manner, close quote. That's at Appendix 2360. So clearly the applicant was distinguishing merit's approach, which relied upon user intervention, right, to convert the mode of the device from the applicant's device, which did not require that manual input. The device just did it using its, quote, built-in processing and other capabilities in a stand-alone manner, close quote. So this statement, this history, this back and forth with the examiner, we believe, clearly shows how the inventor understood the term dynamic as excluding manual user input to execute a conversion between modes of the device. Unless there are any further questions, that's all I have. Thank you, counsel. Thank you. Does Oliver have some rebuttal time? Let me ask you, if we agree with you on issue preclusion, is that limited to Claim 1 and does this case have to go back on the dependent claims? We've argued it for Claim 1. We have not argued it for the dependent claims, so we've asked the court to reverse on Claim 1, hold that that's unpardonable, and then remand for the board to address the dependent claims in light of that new development. Just a few quick points on rebuttal. As to the overall issue, again, this is a unique case where the preclusion analysis effectively collapses down into one limitation. We've compared that particular limitation on a claim-by-claim basis, and we've also addressed how that was specifically litigated against the prior art in the prior cases. My second point is that Smart Mobile's argument today primarily focuses on procedural complaints about proceedings that ended over two years ago, but the opportunity to dispute procedural concerns was via a direct appeal in those cases. We've cited a Second Circuit decision that's helpful in this, the Irish Lesbian and Gay Organization versus Giuliani. Basically, that was a full and fair opportunity to litigate the issue if you had a chance to appeal. My third point, on the actually litigated prong. My friend cited two cases today to address this, Brain Life and Freeman. Freeman actually held that issue preclusion would apply, so I don't think that adds anything particularly to the analysis here. Brain Life was very different on the facts. That case, there was no issue preclusion, but it was because the patent claims at issue, the parties had agreed to dismiss them for lack of prosecution in the prior case, and the court granted that motion and dismissed the claims without prejudice. So that's a very different factual circumstances to show that the claims were not actually litigated. Here, the board found in the prior IPRs that this was properly raised, the St. John reference, particularly for a limitation, excuse me, Claim 2, and so that issue was raised, litigated, and decided in that case. And lastly, unless the court has questions on issue preclusion, I'll just make one final point with respect to claim construction, and that's with respect to Appendix 2359, the prosecution history. I'll just read for the court the last sentence. This is the, I think, critical distinction that was being made in the prosecution history. The applicant says that the merit reference does not describe the very conversion of the calling device or the call device from a first communication protocol to a second communication protocol. So that was the distinction there. It was not about when you are switching from one to another, whether it's manual or automatic. Unless the court has further questions, we would ask the court to reverse and then vacate and remand. Thank you to both parties for cases submitted.